

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 5, 2020

**BY ECF**

The Honorable Andrew L. Carter, Jr.
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

        Re: *United States v. Lawrence Montalbano*, S4 17 Cr. 390 (ALC)

Dear Judge Carter:

In connection with the sentencing of Lawrence Montalbano scheduled for February 19, 2020, the Government respectfully submits this letter, pursuant to Section 5K1.1 of the United States Sentencing Guidelines, to advise the Court that the defendant provided substantial assistance to the Government in the prosecution of other defendants in the above-captioned case.[1] Accordingly, assuming that the defendant continues to comply with the terms of his cooperation agreement and commits no additional crimes before sentencing, the Government intends to move at sentencing, pursuant to Title 18, United States Code, Section 3553(e), for the Court to sentence Montalbano in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

## I. Factual Background

### A. Personal History

Montalbano was born in Brooklyn on September 25, 1966. He is married, has four children, and currently lives in New Jersey. He worked on Wall Street in the 1990s and early 2000s, but left finance. Over the past few years, including during the period of the offense conduct, Montalbano worked in food services and delivered pizza in Staten Island.

During the period of the offense conduct and the period pre-dating it, Montalbano reports that he was in excellent health, having had no major health issues in his life, no medical conditions that cause pain, and no back injuries. As the Government expects the defendant and his counsel will describe at sentencing, Montalbano was recently diagnosed with lymphoma.

---

[1] The Government's sentencing submission was previously filed under seal on February 5, 2020. The Government has since determined, after conferring with defense counsel, that nothing in this letter requires sealing or redaction.

Case 1:17-cr-00390-ALC   Document 244   Filed 03/11/20   Page 2 of 7

Hon. Andrew L. Carter, Jr.                                                                                              Page 2
February 5, 2020

### B. Offense Conduct

The Court is well aware of the offense conduct in this case, having presided over the jury trial of Dr. Taylor in November and December 2018, at which Montalbano testified, and the *Fatico* hearing for Vito Gallicchio in September 2019.

On February 6, 2018, Montalbano was arrested on a superseding indictment charging him with one count of conspiring to distribute and possess with intent to distribute controlled substances, specifically oxycodone, in violation of Title 21, United States Code, Section 846. The charges arose out of an unlawful scheme perpetrated by David Taylor, a Staten Island physician who operated a medical clinic that distributed large quantities of oxycodone to purported "patients," many of whom were recruited by Vito Gallicchio, a co-conspirator charged in the superseding indictment. Montalbano was one of the "patients" recruited by Gallicchio to go to Taylor to receive oxycodone prescriptions. Taylor wrote medically unnecessary oxycodone prescriptions for Gallicchio and the "patients" he directed, including Montalbano, and in turn received from Gallicchio cash payments, liquor, cigars, and gifts such as electronics. After seeing Taylor, these "patients," including Montalbano, shared their oxycodone prescriptions with Gallicchio in exchange for cash. Gallicchio filled and directed his co-conspirators to fill these prescriptions, and then sold the oxycodone pills himself and to other drug deals who in turn sold the pills to third parties.

Montalbano met first Vito Gallicchio at DiLeo's Pizza in Staten Island approximately five and a half years ago. Montalbano worked at the pizzeria, and Gallicchio was a frequent customer. In June 2014, Gallicchio approached Montalbano at the pizzeria and asked him if he wanted to make money by going to a doctor to obtain oxycodone pills. Gallicchio told Montalbano that it would be easy and that Montalbano would not need to do anything, stating, in substance, that all Montalbano needed to do was go to the doctor, obtain a referral for an x-ray, and then he was "in." Montalbano needed money, so he agreed. Gallicchio instructed Montalbano to say that his back hurt and that oxycodone was the only thing that made it feel better. Gallicchio stated that if there was a problem, he would talk to the doctor, and gave Montalbano the phone number for Taylor's office on Victory Boulevard. Gallicchio told Montalbano that after Montalbano got the prescription and filled it, Gallicchio would pay $15 per pill.

Montalbano called the clinic, said he was a new patient with back pain, and made an appointment. Gallicchio accompanied Montalbano to his first appointment, and introduced Montalbano to an office assistant there. During the first visit, Montalbano told Taylor that he was in pain. Taylor subsequently wrote Montalbano a prescription for 120 thirty-milligram tablets of oxycodone, Montalbano filled the prescription, and then sold the pills to Gallicchio for between $1,050 and $1,125. After three to six months of seeing Taylor, Gallicchio asked Montalbano about getting more pills, so Montalbano told Taylor that he was running out of pills, and Taylor raised Montalbano's monthly pill count to 150 pills.

Gallicchio told Montalbano that he conferred benefits to Taylor. Gallicchio told Montalbano that he had purchased a television and refrigerator for Taylor, and had given Taylor cigars and expensive liquor. Gallicchio told Montalbano that he should bring food for Taylor's

staff and a bottle of McCallum whiskey for Taylor around Christmas time, which Montalbano did. Montalbano recalls one occasion where he went in for an appointment, forgot to bring food, and Taylor said, in substance, "don't worry, I'll come get it." Later that day, Taylor showed up at the pizzeria where Montalbano worked and got a free dinner of chicken parmesan with spaghetti. Montalbano gave Taylor the food for free because he understood that if he gave food to Taylor and his staff, he was able to skip the line at Taylor's office.

### C.  Other Criminal Conduct

Montalbano has been convicted in New Jersey for shoplifting on January 26, 2014, and July 17, 2016. According to Montalbano, on the first occasion, in 2014, he walked out of a store without paying for groceries, and on the second occasion, he helped an older man steal goods from a shopping mall. He paid fines for both offenses.

Additionally, in 2015 or 2016, Montalbano was privy to a robbery committed by Gallicchio and others, and may qualify as an accessory after the fact. Specifically, Montalbano sat in a car with Gallicchio while a third individual robbed a deli of money. Montalbano states that he was not aware of the robbery until that third individual got into the car with stolen money. He believes, however, that Gallicchio knew what was going on and that Gallicchio got a share of the stolen funds. Montalbano, Gallicchio, and the third individual fled from the scene of the robbery.

### D.  The Presentence Investigation Report

The United States Probation Department issued the final Presentence Investigation Report (the "PSR") on March 28, 2019. The PSR calculates a total offense level of 29, and a criminal history category of one, resulting in an applicable sentencing range of 87 to 108 months' imprisonment under the Guidelines. *See* PSR ¶ 78.

### E.  Cooperation

As is noted above, Montalbano was arrested on February 6, 2018. Shortly after his arrest, Montalbano, through his counsel, expressed interest in cooperating. On February 27, 2018, and March 20, 2018, Montalbano proffered about his conduct and the conduct of his co-conspirators. Following the second proffer, Montalbano and his attorney signed a Finzi letter permitting Montalbano to meet directly with the case agents. Montalbano informed the agents that Gallicchio and other uncharged individuals were attempting to purchase narcotics over the internet. Montalbano then attempted to cooperate proactively with law enforcement. On October 2, 2018, Montalbano proffered about his conduct for a third time, and was also debriefed about his criminal history. Montalbano subsequently pleaded guilty to a cooperation agreement. The Government met with him on multiple occasions before the trial of Taylor. Montalbano testified at the Taylor trial, and his trial testimony was subsequently admitted into evidence at the Gallicchio *Fatico* hearing.

Over the past two years, Montalbano has provided substantial assistance to the Government in at least three ways. First, Montalbano was a critical witness in the trial of Taylor. Montalbano testified about Taylor's prescribing practices, the gifts that were given to Taylor, and Taylor's own

incriminating statements. Montalbano met with the Government on nearly ten occasions and gave the jury an important look into the conversations amongst members of the conspiracy. Second, Montalbano's testimony was an important part of the proof against Gallicchio. Given the close relationship between Montalbano and Gallicchio in the conspiracy, the prospect of Montalbano's testimony at trial must have played a significant role in Gallicchio's decision to plead guilty without a plea agreement with the Government. Furthermore, Montalbano's testimony was an important part of the proof against Gallicchio at the *Fatico* hearing. Third, Montalbano attempted to cooperate proactively against Gallicchio, further exposing himself to risks of harassment and intimidation. While ultimately no charges arose from this proactive cooperation, Montalbano provided valuable leads to the DEA that led to the execution of legal process.

For all of these reasons, and as further detailed below, the Government submits that Montalbano has provided substantial assistance to the Government and should be sentenced in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

## II. Section 5K1.1 Factors

Section 5K1.1 of the Guidelines sets forth five non-exclusive factors that sentencing courts are encouraged to consider in determining the appropriate sentencing reduction for a defendant who has rendered substantial assistance. *See* U.S.S.G. §5K1.1(a). The application of each of those factors to Montalbano's cooperation is set forth below.

### A. "[S]ignificance and usefulness of the defendant's assistance" (§5K1.1(a)(1))

Montalbano's assistance was both significant and useful in the following ways.

First, Montalbano was an important witness at trial and provided significant information about Taylor's practice and relationship with Gallicchio. Montalbano explained how Gallicchio introduced him to Taylor, accompanied him to his first visits, and gave him instructions about what to say. Montalbano also testified regarding Taylor's prescribing practices, including the lack of physical examinations conducted by Taylor, the infrequent urine tests, the changes in Taylor's dosing practices, and the false documentation that Taylor wrote in his medical charts. Montalbano also described the setting of Taylor's office, the types of patients who attended (including many visibly addicted to drugs), and the other members of the conspiracy who visited Taylor as purported patients. Perhaps most importantly, Montalbano testified to particular facts relevant to Taylor's consciousness of wrongdoing. For example, Montalbano recounted an incident when he was in the waiting room and Taylor came out and yelled at the patients, "be quiet or no one is getting anything." Montalbano also testified about the gifts and money that were given to Taylor.

Second, Montalbano testified about Gallicchio's sale and distribution of pills. Montalbano gave the jury at trial an inside look into how Gallicchio operated his oxycodone distribution ring, and that evidence was admitted at the Gallicchio *Fatico* hearing. Montalbano explained where Gallicchio got the pills, identifying other phony patients that Gallicchio recruited. He also identified multiple members of Gallicchio's network of distributors to whom Gallicchio sold large quantities of oxycodone. Montalbano also explained how much Gallicchio charged for the pills (about $15 per pill), and where and how often pill deliveries and cash exchanges took place.

Third, as noted above, Montalbano provided information about a separate narcotics conspiracy being perpetrated by Gallicchio, and attempted to proactively assist the DEA in investigating that offense. Specifically, Montalbano informed the DEA that after Gallicchio was arrested in 2017, he made an agreement with two other individuals to participate in a scheme in which they would make recurring monthly purchases of oxycodone over the "dark web" using an encrypted laptop. Montalbano identified the co-conspirators, told the DEA about where Gallicchio and his co-conspirators purchased the laptop, and recounted all of the facts Montalbano knew about the scheme. The information provided by Montalbano was used to obtain legal process to advance the investigation. Ultimately, the information provided by Montalbano did not result in additional charges against Gallicchio or others, but without Montalbano's assistance, the Government would have been unaware of the scheme.

### B. "[T]ruthfulness, completeness, and reliability" of the defendant's information and testimony (§5K1.1(a)(2))

The defendant has been truthful with the Government from the outset of his cooperation. The information he has provided has been complete, reliable, and corroborated by other evidence developed during the investigation, including (1) data from the New York Bureau of Narcotic Enforcement and from the New Jersey Prescription Monitoring Program, (2) information gathered from Taylor's patient files, including the results of urinalysis tests, (3) observations made during law enforcement surveillance operations, (4) information provided by other cooperating witnesses, and (5) other independent evidence developed by the Government.

### C. "[N]ature and extent of the defendant's assistance" (§5K1.1(a)(3))

As detailed herein, Montalbano has provided extensive assistance with respect to numerous members of the oxycodone distribution conspiracy. He did so in several ways: (1) during proffer sessions and trial preparation sessions with the Government, (2) in close to real-time due to his constant communication with Detective Matthew Del Rosario, the agent in charge of the investigation, and (3) from the witness stand at the Taylor trial.

Montalbano attended approximately eight in-person proffer and trial preparation sessions with the Government. During those meetings, he provided detailed, first-hand information about, as forth above, his own involvement in the oxycodone distribution scheme, Gallicchio, Taylor, other patients Gallicchio recruited into the conspiracy, and Gallicchio's distributors. Montalbano also provided information about other criminal activity of Gallicchio, including about his participation in a Hobbs Act robbery of a Staten Island-based deli, and an oxycodone diversion scheme utilizing the "dark web." While the Government was unable to develop enough evidence to charge Gallicchio for the robbery and "dark web" scheme (and may not have been able to establish venue in this District), law enforcement used Montalbano's information to pursue potential leads.

Montalbano also provided assistance by giving near real-time updates to Detective Del Rosario, which allowed law enforcement to investigate the "dark web" oxycodone scheme described above.

Hon. Andrew L. Carter, Jr.  Page 6
February 5, 2020

Finally, Montalbano provided substantial assistance in the form of testimony at the Taylor trial. Despite a rigorous cross-examination, Montalbano testified forthrightly about several sharply disputed issues of fact, and was critical to the Government's proof that Taylor knew what he was doing was wrong.

### D. "[I]njury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance" (§5K1.1(a)(4))

As the Court is well aware, danger or risk of injury attaches to many situations in which cooperation takes place. Here, as the Court knows from the *Fatico* hearing, Gallicchio engaged in obstructive conduct and a campaign of intimidation towards witnesses. Montalbano told the Government that he felt pressured by Gallicchio and his associated not to cooperate with the Government, and in some instances was harassed by individuals affiliated with Gallicchio. This became such an issue for Montalbano that he relocated his family, left his job, and moved to a different party of New Jersey. Thus, Montalbano, due to his cooperation, faced risks to himself and his family in the past and there is reason to believe he will continue to face those risks in the small community of Staten Island in the future.

### E. "[T]imeliness of the defendant's assistance" (§5K1.1(a)(5))

Montalbano began cooperating with the Government shortly after he was arrested. Specifically, as is noted above, Montalbano was arrested on February 6, 2018, and shortly after his arrest, Montalbano, through his counsel, expressed interest in cooperating. On February 27, 2018, and March 20, 2018, Montalbano proffered about his conduct and the conduct of his co-conspirators. From that time forward, he continued to proactively assist the DEA and meet with the Government as needed. At no time during those proffer sessions did Montalbano deny his participation in the scheme, minimize his conduct or the conduct of others, or make false statements. Montalbano's timely assistance allowed the Government to investigate other crimes by Gallicchio, proceed with confidence in plea discussions with Garcia and Don Carim, and prepare for trial against Taylor and, if it had been necessary, Gallicchio. In short, Montalbano provided reliable, timely information shortly after he was arrested.

Hon. Andrew L. Carter, Jr.  Page 7
February 5, 2020

### III. Conclusion

In light of the facts set forth above, and assuming that the defendant continues to comply with the terms of his cooperation agreement, the Government intends to request at sentencing that the Court sentence the defendant in light of the factors set forth in Section 5K1.1 of the Guidelines. In addition, because of the sensitive nature of the information contained in this letter, including details of the defendant's cooperation, the Government respectfully requests that this letter be filed under seal.

        Respectfully submitted,

        GEOFFREY S. BERMAN
        United States Attorney for the
        Southern District of New York

By: /s/
        Kiersten A. Fletcher
        Nicolas Roos
        Justin V. Rodriguez
        Assistant United States Attorneys
        (212) 637-2238/2421/2591

cc: William Stampur, Esq. (by email)
     Jonathan J. Bressor, United States Probation Officer (by email)